**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**CIVIL ACTION NO. 3:22-cv-00457**

| | |
|---|---|
| SVB FINANCIAL GROUP and SVB SECURITIES HOLDINGS LLC,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL DRENDEL,<br><br>Defendant. | **VERIFIED COMPLAINT** |

Plaintiffs SVB Financial Group and SVB Securities Holdings LLC (together with their subsidiary SVB Securities LLC, "SVB"), by their attorneys Gardner Skelton PLLC, allege for their Verified Complaint against Defendant MICHAEL DRENDEL as follows:

**NATURE OF THE CASE**

1. SVB brings this action to enforce the three-month Non-Compete Provision that Defendant Michael Drendel agreed to honor in exchange for a seven-figure retention bonus. Drendel, a Charlotte-based former Senior Managing Director in SVB's health care investment banking group, has violated this Non-Compete Provision. Just a few days after his last official day as an SVB employee, Drendel started working as a Managing Director for Raymond James, a direct competitor that hired him into a virtually identical healthcare investment banking role to build its health care investment banking presence in Charlotte.

2. Drendel announced his resignation from SVB on May 16, 2022, which triggered a contractual 90-day paid garden leave that set August 14, 2022 as Drendel's last day of employment with SVB. Because the Non-Compete Provision's Restricted Period runs for three

months after Drendel's last day of employment, Drendel is barred from competing with SVB until November 14, 2022. SVB now knows, however, that Drendel started working for Raymond James on or about August 17, 2022, just three days into his three-month non-compete period.

3. Drendel was the most senior investment banker on SVB's Specialty Pharmaceutical team, advising and representing domestic and international clients on mergers and acquisitions (M&A) transactions in a competitive industry subsector where only a small number of deals typically occur per year. Drendel, one of only two Specialty Pharmaceutical team members with a book of business, often served as the primary point of contact for prospective clients during the pitching process and as the primary relationship manager and advisor to clients once they had engaged SVB to execute a transaction.

4. During his seven years of employment at SVB, Drendel built relationships and goodwill with both engaged and prospective clients based on contacts and introductions that SVB facilitated. These clients and prospective clients were the sources of new and repeat business for SVB and entrusted SVB with material non-public information about their businesses and potential deals. As Drendel specifically acknowledged, the Non-Compete Provision's express purpose was to protect SVB's interest in the relationships and the resulting goodwill and information. Before his resignation, Drendel was directly involved in discussions with at least six potential clients who remain active prospects and could collectively generate at least $20 million in fees for SVB. Similarly, Drendel had direct involvement in multiple formal client engagements for transactions that have yet to be completed, which could collectively generate at least $10 million in fees for SVB in the next 12 months.

5. SVB faces irreparable harm if this Court does not enjoin Drendel from working at Raymond James or for any competitor in the health care investment banking industry until after November 14, 2022. Drendel should not be allowed to violate the Non-Compete and win business for Raymond James by prematurely exploiting the relationships he developed at SVB or the information he learned about current and prospective clients and their potential deals. This Court should enter appropriate injunctive relief and award SVB any damages resulting from Drendel's breach.

## PARTIES

6. Plaintiff SVB Financial Group ("SFVFG") is a corporation organized under Delaware law with its principal place of business at 3003 Tasman Drive, Santa Clara, California. Plaintiff SVB Financial Group therefore is a citizen of Delaware and California.

7. Plaintiff SVB Securities Holdings LLC ("Holdings") is limited liability company organized under Delaware law with its principal place of business at 53 State Street, 40th Floor, Boston, Massachusetts. Plaintiff Holdings' sole member is Plaintiff SVBFG, a corporation organized under Delaware law with its principal place of business in California. Plaintiff Holdings therefore is a citizen of Delaware and California.

8. SVB Securities LLC ("SVB Securities") is a limited liability company organized under Delaware law with its principal place of business at 53 State Street, 40th Floor, Boston, Massachusetts. SVB Securities' sole member is Plaintiff Holdings. SVB Securities, previously known as Leerink Partners LLC and then SVB Leerink LLC, is an investment bank that is a registered broker-dealer. SVB Securities was Drendel's employer at all times relevant but is not a plaintiff in this action because it was not a named party to the agreement at issue here.

9. Defendant Michael Drendel is a natural person domiciled in Charlotte, North Carolina and is therefore a citizen of North Carolina.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(a)(1) because (a) there is complete diversity of citizenship among the parties, such that neither Plaintiff is a citizen of the same state as Defendant and (b) the amount in controversy exceeds $75,000, exclusive of interest and costs.

11. Venue is proper in the Western District of North Carolina under 28 U.S.C. § 1391(b)(1) because Defendant resides here.

## FACTS

12. From about March 2015 until August 2022, Drendel was employed as a health care investment banker on SVB's Specialty Pharmaceuticals team, finishing his tenure as a Senior Managing Director and the head of SVB's small Charlotte office. At his departure, Drendel was the Specialty Pharmaceuticals team's most senior investment banker.

13. At SVB, Drendel advised and represented domestic and international clients in mergers and acquisitions ("M&A") transactions involving companies in the specialty and generic pharmaceutical sector. This sector is highly competitive for investment banks because only a small number of deals typically occur per year. For example, only about 10-20 of these M&A transactions take place in the United States in any given year, and there are dozens of investment banks vying for this business.

14. Drendel's clients included both potential acquirers of specialty and generic pharmaceutical companies ("buy-side") and companies in this sector looking to sell ("sell-side") themselves or substantial assets. SVB's health care investment banking group conducted

worldwide business through telephone and internet, working with and competing for clients located throughout the world, including in the United States, India, Japan, and countries within the European Union.

15. Within the Specialty Pharmaceuticals team, only Drendel and Senior Managing Director Byron Webster had books of business. Potential clients usually came to the Specialty Pharmaceuticals team looking to work with Drendel, Mr. Webster, or both. Raymond James also attempted—so far unsuccessfully—to lure Mr. Webster away from SVB at the same time as it courted Drendel.

16. Drendel played a major role in obtaining clients for the Specialty Pharmaceuticals team, often serving as SVB's primary point of contact with potential clients while SVB tried to win their business.

17. Drendel also played a major role in maintaining client relationships, often serving as the primary advisor to, and relationship manager for, existing Specialty Pharmaceuticals clients during a transaction.

18. During his seven years with SVB, Drendel built significant relationships with current and former clients, some of whom referred new clients to SVB based on their relationship with Drendel. Further, some principals of former clients would start new ventures and seek Drendel's advice and representation when these new ventures were involved in an M&A transaction.

19. In 2020 and 2021, the Specialty Pharmaceuticals group at SVB generated millions of dollars of revenue for the firm. In M&A, investment banks earn fees when a transaction is successfully completed, and the amount of the fee is typically a negotiated percentage of the value of the transaction. As the most senior member of the team, Drendel was a key reason why

clients chose to engage SVB, and he personally executed a large number of successful transactions. As a result, Drendel was paid based on his and the team's success, earning over $21 million in total compensation during his tenure at SVB.

***Drendel's 2014 Employment Agreement and 2018 Retention Agreement***

20. Drendel signed an offer letter with Leerink Partners LLC, the name by which SVB Securities was previously known, on or about December 10, 2014 (the "2014 Offer Letter"). A true and correct copy of the 2014 Offer Letter is attached as Exhibit 1. Drendel did not commence his employment with SVB Securites immediately, however, because he honored—with SVB Securities' full support—his contractual notice provision with his former employer. Such notice provisions (commonly referred to as "garden leave" provisions) are standard in the financial services/investment banking industries. Accordingly, Drendel's employment with SVB began in March 2015, following his garden leave .

21. The 2014 Offer Letter contains a section titled "Notice of Retirement/Resignation," which provides that Drendel "shall not voluntarily retire, resign, or otherwise terminate [his] employment with [Leerink Partners LLC] or any of its affiliates" without first sending certified mail "giving the Company at least ninety (90) days prior written notice of the effective day of [his] retirement, resignation, or other termination," and further provides that the "Company retains the right to . . . place you on paid leave for all or part of this ninety (90) day period" (the "Garden Leave Provision"). This is the 90-day "Garden Leave Period" to which Drendel agreed at the commencement of his employment. The 2014 Offer Letter also included a guaranteed bonus for Drendel in excess of $6,000,000.00, as well as a special deferred grant of more than $1.3 million to compensate Drendel for deferred

compensation that he was forfeiting by voluntarily resigning from his previous employer. (Ex. 1 at 5.) The 2014 Offer Letter is governed by New York law. (*Id.* at 8.)

22. In or about the fall of 2018, Plaintiff SVBFG entered negotiations to acquire the Leerink businesses. On November 11, 2018, Drendel entered a retention agreement with Plaintiff SVBFG and Leerink Holdings LLC (now Plaintiff Holdings) (the "2018 Retention Agreement"), which was contingent on the completion of the acquisition. A true and correct copy of the 2018 Retention Agreement is attached as Exhibit 2.

23. The 2018 Retention Agreement provides that it "shall in all respects be governed by the laws of New York, without giving effect to its conflicts of law principles" and that New York law "govern[s] all matters arising out of or relating to this Agreement, including its interpretation, construction, performance, and enforcement." (*Id.* at ¶ 6(i).)

24. In recognition of Drendel's status as a "key employee of Leerink" and "importance to the integration of Leerink with [SVB]," the 2018 Retention Agreement provided Drendel with a mixed cash and stock retention bonus worth $2,000,000.00 if Drendel remained with the merged company for five years after the acquisition's closing date. (Ex. 2 at Preamble, ¶ 1.) Under the 2018 Retention Agreement, one-fifth of the bonus was to vest and be paid on each anniversary of the closing date on which Drendel remained with SVB, continuing until the bonus fully vested and was paid. (*See id.* at 1.) When Drendel provided notice of his intention to resign, he had received three of the five scheduled annual payments of his retention bonus, totaling $1.2 million.

25. In exchange for the retention bonus, Drendel agreed to the Non-Compete Provision, among others. (*Id.* at ¶ 4(d).)

26. Under the Non-Compete Provision, Drendel agreed that "during the Restricted Period" he would not "directly or indirectly act as a "proprietor, director, officer, employee, substantial shareholder . . ., consultant, or partner in any Competitive Enterprise." (*Id.* at ¶ 4(d).)

27. As relevant here, the Restricted Period remains in effect "during [Drendel's] employment and for 3 months following the termination of [his] employment for any reason." (*Id.* at ¶ 4(a)(2).)

28. Under the 2018 Retention Agreement, "Competitive Enterprise" means:

a. "any business that engages in investment banking, commercial banking, sell-side equity research or securities sales and trading activity, in each case in the industries in which [SVB] or Leerink performs services or offers products during the course of [Drendel's] employment[;]"

b. "any investment funds business that is in competition with a fund operated by [SVB] or any of its subsidiaries that is in operation or is actively being marketed during the course of [Drendel's] employment[;]" or

c. "any other activity in which [SVB] or Leerink engages during the course of [Drendel's] employment in which [he] participate[s]."

(*Id.* at ¶ 4(a)(1).)

29. Drendel recognized in the 2018 Retention Agreement that, during the course of his employment, he would have "access to confidential and proprietary information and to all or part of the Company's client base and may profit from the goodwill associated with [SVBFG]" and that violating or threatening to violate the Non-Compete Provision would "cause damage" to SVB that "cannot be measured or repaired." (*Id.* at ¶ 4(b)(1).) Drendel also agreed that that the Non-Compete Provision was "reasonable in both duration and geographic scope and in all other respects," and that SVB would be entitled to seek "an injunction, restraining order or other equitable relief" for any actual or threatened violation of the Non-Compete, without having to post a bond or prove that SVB had no adequate remedies at law. (*Id.* at ¶¶ 4(f)-(g).)

30. Drendel further agreed that, while the Non-Compete Provision was in effect, he would provide any prospective new employer with written notice of the Non-Compete Provision and other restrictive covenants before accepting employment. (*Id.* at ¶ 4(e).)

31. Plaintiff SVBFG's acquisition of Plaintiff SVB Securities Holdings LLC (then known as Leerink Holdings LLC) and its subsidiary SVB Securities LLC (then known as Leerink Partners LLC) closed on January 4, 2019, making the 2018 Retention Agreement effective. Drendel personally profited from the acquisition because he owned equity in the firm.

32. Drendel remained employed by SVB Securities through three closing anniversaries (2020-2022). Under the 2018 Retention Agreement, Drendel was paid $1.2 million ($600,000 in cash and $600,000 in SVBFG stock) in addition to his substantial annual base salary and even larger discretionary bonuses.

***Plaintiff Resigns and Begins Working for Direct Competitor Raymond James in Violation of the Non-Compete Provision***

33. Beginning in around 2021, direct competitor Raymond James began actively recruiting several Charlotte-based SVB health care investment bankers, including members of the Specialty Pharmaceuticals group. Among those solicited were Drendel, Senior Managing Director Byron Webster, Director Don Matz, Vice President Juan Carlos Barreto, and certain other associates, analysts, and members of the support staff.

34. Raymond James is a Competitive Enterprise under the 2018 Retention Agreement because it (i) engages in investment banking, an industry in which SVB "perform[ed] services or offer[ed] products" during Drendel's employment and (ii) it engages in health care investment banking, an activity in which Drendel participated during his employment with SVB. (*See* Ex. 2 at ¶ 4(a)(1).) Moreover, Drendel's position with Raymond James is in Charlotte, North Carolina, just a short distance from his prior office location with SVB in Charlotte.

35. On May 16, 2022, Drendel sent an email to SVB Vice Chairman/Global Co-Head of Investment Banking Dan Dubin and SVB Managing Director/Business Manager of Investment Banking Christine Del Corsano. A true and correct copy of this email is attached as Exhibit 3. In this email, Drendel ignored the 90-day Garden Leave Provision in his 2014 Offer Letter, writing that "this email serves as notice that I am resigning from the firm effective immediately." (*Id.* at 1.)

36. Although Drendel did not submit his notice by certified mail, as required by the 2014 Employment Agreement (*see* Ex. 1 at 5), SVB accepted Drendel's notice of resignation as the beginning of Drendel's 90-day Garden Leave.

37. SVB cautioned Drendel in a May 17, 2022, letter (a true and correct copy of which is attached as Exhibit 4) that SVB "currently intend[ed] to enforce" Drendel's "three-month notice period" under the 2014 Offer Letter and expected Drendel to "comply fully with [his] restrictive covenants" under the 2018 Retention Agreement, including the Non-Compete Provision. (Ex. 4 at 1.) On the same day, May 17, 2022, SVB wrote to Raymond James' general counsel to ensure that Raymond James was alerted to Drendel's ongoing obligations (a true and correct copy of which is attached as Exhibit 5).

38. Based on the Garden Leave Provision in the 2014 Offer Letter, Drendel's May 16, 2022 notice of resignation triggered a 90-day Garden Leave Period, setting Drendel's termination date at August 14, 2022. Consequently, the Restricted Period under the 2018 Retention Agreement ends on November 14, 2022, three months after Drendel's termination date.

39. Because Drendel remained an SVB employee during the Garden Leave Period, SVB continued to pay Drendel his salary between May 16 and August 14, 2022, even though

Drendel was not required to—and did not—do any actual work for the firm. During Drendel's Garden Leave Period, SVB made six direct deposits into Drendel's bank account totaling $79,747.12. In total, Drendel has received more than $275,000 of his $450,000 annual salary in 2022.

40. On August 15, 2022, the day after Drendel's Garden Leave ended, Drendel attempted to return this money by check, claiming in an attorney's letter (a true and correct copy of which is attached as Exhibit 6) that his termination was effective as of May 16 (i.e., immediately upon notice, with no 90-day Garden Leave Period). SVB refused to accept this check, stating in an August 19, 2022 email (a true and correct copy of which is attached as Exhibit 7) that it would not cash it, and warned Drendel (and Raymond James) that it would take necessary and appropriate steps if Drendel began working at Raymond James before the Non-Compete expired in November 2022.

41. Despite the unambiguous language of the Non-Compete Provision and clear warnings from SVB, Drendel chose to breach his contractual obligations and started working at Raymond James almost immediately.

42. According to FINRA records, Drendel has been registered with Raymond James since August 19, 2022. A true and correct copy of Drendel's FINRA BrokerCheck report as of September 2, 2022 is attached as Exhibit 8. Drendel's position at Raymond James is the same as or substantially similar to his position at SVB. (Ex. 8.)

43. Raymond James issued a press release dated August 17, 2022, a true and correct copy of which is attached as Exhibit 9 and, as of September 2, 2022, is available on Raymond James's website at https://www.raymondjames.com/news-and-media/press-releases/2022/08/17/raymond-james-adds-to-growing-healthcare-investment-banking-practice

The press release stated that Raymond James was "expanding its Healthcare Investment Banking practice" and "establishing an investment banking presence in Charlotte" through the "hiring of four senior investment bankers," including Drendel, Mr. Matz, and Mr. Barreto. (Ex. 9 at 1.) Mr. Matz resigned from SVB the same day as Drendel and Mr. Barreto resigned from SVB in June 2022.

44. The press release acknowledged that Drendel had "led the specialty and generic pharmaceutical franchise" as a senior managing director at SVB. (Ex. 9 at 2.)

45. The press release emphasized the importance of these new hires (including Drendel) and their deep industry experience and contacts, quoting the president of Raymond James Global Equities and Investment Banking: "[W]e're able to add this Charlotte office and fill it with four talented and respected senior bankers who are plugged into every corner of healthcare." (*Id.*)

46. Raymond James's website currently lists Drendel as a Managing Director in the Charlotte office and part of the senior banking team for Healthcare Investment Banking. A true and correct copy of the relevant page is attached as Exhibit 10 and, as of September 2, 2022, was available at https://www.raymondjames.com/corporations-and-institutions/investment-banking/industries-of-focus/health-care.

47. Drendel's public profile on LinkedIn indicates that he is Managing Director at Raymond James, from August 2022 to the present, and includes a post stating "I'm happy to share that I'm starting a new position as Managing Director at Raymond James . . . ." A true and correct copy of the relevant page, as it appeared on August 31, 2022, is attached as Exhibit 11. Contrary to Drendel's assertion that his employment with SVB ended in May when he gave

notice, the same LinkedIn profile indicates that he was employed with SVB until August 2022. (*Id.* at 1.)

48. At the time of Drendel's resignation, Drendel was directly involved in active discussions with at least six potential clients interested in hiring SVB's Specialty Pharmaceuticals group to represent them in potential M&A transactions, both on the buy-side and sell-side. All these potential clients remain active prospects as of late August 2022 and potentially could generate at least $20 million in fees for SVB.

49. Drendel also had direct involvement in multiple formal client engagements for transactions that have yet to be completed, which could collectively generate at least $10 million in fees for SVB in the next 12 months.

50. It is not publicly known that all or some of these active prospective clients on the buy-side are looking to acquire their potential targets, nor it is publicly known that one or more of these active prospective clients on the sell-side are looking to sell themselves or their assets. Further, these active prospective clients shared information with Drendel about the potential transaction, as well as highly sensitive and confidential information about company performance and strategic plans, among other things.

51. Drendel comes into his new employment at Raymond James with sources of new business and referrals that he developed over seven years at SVB, as well as relationships with and information about SVB's engaged clients and active prospects—and their M&A transactions as well as broader strategic and business plans—that he can exploit to SVB's disadvantage and to Raymond James' direct benefit. This Court should not allow Drendel a three-month head start towards capitalizing on them when the Non-Compete Provision, for which SVB already paid Drendel $1,200,000.00, requires Drendel merely to wait until November.

**FIRST CLAIM**
**(Breach of Contract)**

55. SVB repeats and incorporates by reference all prior allegations of this Complaint as if fully set forth herein.

56. Drendel entered into the 2018 Retention Agreement with SVB, which included the Non-Compete Provision.

57. The 2018 Retention Agreement, including the Non-Compete Provision, is a valid and enforceable contract to which Drendel agreed to be bound.

58. SVB has performed all of its obligations under the 2018 Retention Agreement, including by paying Drendel $1,200,000 of his retention bonus.

59. As described above, Drendel breached the Non-Compete Provision in the 2018 Retention Agreement by working for Raymond James, SVB's direct competitor, during the Restricted Period.

60. As a direct and proximate result of Drendel's breach of contract, SVB has suffered and will continue to suffer irreparable harm as well as sustain monetary damages in an amount to be proven at trial.

WHEREFORE, SVB seeks the following relief:

1. A temporary restraining order, preliminary injunction, and permanent injunction enjoining and restraining Drendel from (a) working in the health care investment banking industry for Raymond James or any other competitor of SVB until after November 14, 2022; and (b) otherwise violating the Non-Compete Provision of his 2018 Retention Agreement on or before November 14, 2022;

2. All damages caused by Drendel's unlawful actions in an amount to be determined at trial, plus interest, costs, and disbursements;

3. Such other and further relief as this Court deems just and proper.

Dated: September 2, 2022

**GARDNER SKELTON PLLC**

__s/ Mark S. Pincus__________________________
Jared E. Gardner (N.C. State Bar No. 28275)
Mark S. Pincus (N.C. State Bar No. 59036, N.Y. State Bar No. 4668539)
505 East Boulevard
Charlotte, North Carolina 28203
Telephone: (704) 335-0350
Facsimile: (704) 390-7027
jared@gardnerskelton.com
mark@gardnerskelton.com
*Attorneys for Plaintiffs*

## VERIFICATION

I, DAN DUBIN, hereby declare that I am Vice Chairman and Co-Head of Investment Banking at SVB. I have read the foregoing Verified Complaint and, based upon my work, actions, and/or firsthand observations and experiences in my capacity as an SVB employee and/or officer, and my review of records kept by SVB in the course of its regularly conducted business activities (which records are made at or near the time of the event or circumstance to which they relate, or from information transmitted from a person with knowledge, and the making and maintenance of which is the regular practice of SVB), I know the statements contained in the Complaint to be true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 2, 2022

______________________________
DAN DUBIN